MAHONING COUNTY BAR ASSOCIATION *v*. SINCLAIR.

[Cite as *Mahoning Cty. Bar Assn. v. Sinclair*,

105 Ohio St.3d 65, 2004-Ohio-7014.]

*Attorneys at law — Misconduct —— Engaging in conduct involving dishonesty or deceit — Engaging in conduct adversely reflecting on fitness to practice law — Indefinite license suspension required when attorney has paid illegal gratuities to public official.*

(No. 2004-1064 — Submitted October 12, 2004 — Decided December 29, 2004.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 03-045.

————————————————

**Per Curiam**.

{¶ 1} Respondent, R. Allen Sinclair of Boardman, Ohio, Attorney Registration No. 0055915, was admitted to the practice of law in Ohio in 1991. On March 29, 2000, we ordered a six-month suspension of respondent's license, which we stayed, for his failure to comply with requirements for advertising his legal services. We placed respondent on probation for one year with conditions. See *Mahoning Cty. Bar Assn. v. Sinclair* (2000), 88 Ohio St.3d 328, 725 N.E.2d 1114. The court terminated respondent's probation on June 22, 2001. See *Mahoning Cty. Bar Assn. v. Sinclair* (2001), 92 Ohio St.3d 1425, 749 N.E.2d 753.

{¶ 2} On May 13, 2003, relator, Mahoning County Bar Association, charged respondent with additional violations of the Code of Professional Responsibility, all of which involved his association with former United States Congressman James A. Traficant Jr., who had been convicted of conspiracy to commit bribery, conspiracy to violate illegal-gratuity statutes, accepting an illegal gratuity, obstructing justice, conspiring to defraud the federal government, filing

false tax returns, and racketeering. See *United States v. Traficant* (C.A.6, 2004), 368 F.3d 646 (convictions affirmed). A panel of the Board of Commissioners on Grievances and Discipline heard the cause, made findings of misconduct, and recommended that respondent be suspended from the practice of law for two years, with 18 months stayed on the condition that he commit no further misconduct. The board adopted the panel's findings of misconduct but recommended a two-year suspension.

Misconduct

**{¶ 3}** The complaint alleged misconduct in three separate but related events: (1) respondent's kickbacks to Traficant from his salary as a congressional staff member, (2) respondent's agreement to rent Traficant office space through KAS Enterprises, and (3) respondent's preparation of a quitclaim deed for Traficant to transfer some property to Traficant's daughter. The complaint charged that respondent had in the course of these events violated DR 1-102(A)(3) (barring illegal conduct involving moral turpitude), 1-l02(A)(4) (barring conduct involving dishonesty, fraud, deceit, or misrepresentation), 1-102(A)(6) (barring any conduct that adversely reflects on a lawyer's fitness to practice law), 7-102(A)(6) (prohibiting a lawyer from using false evidence), 7-102(A)(7) (prohibiting a lawyer from counseling or assisting a client in illegal or fraudulent conduct), and 7-102(A)(8) (prohibiting any illegal conduct or act in violation of a Disciplinary Rule).

**{¶ 4}** Upon graduation from law school, respondent started a private law practice and leased office space from then attorney Henry A. DiBlasio in Youngstown. In addition to practicing law, DiBlasio was Traficant's chief of staff and had been for years. DiBlasio eventually resigned from the Ohio bar with disciplinary action pending. See *In re Resignation of DiBlasio*, 99 Ohio St.3d 1207, 2003-Ohio-2733, 789 N.E.2d 239.

**{¶ 5}** Respondent came to rely on DiBlasio as his mentor, and from this relationship, respondent's ethical problems developed. DiBlasio had an extensive general law practice that included corporate representation. DiBlasio also served as a special counsel to the Ohio Attorney General, overseeing collection cases with sales-tax issues. Respondent helped DiBlasio in his practice and also started accepting criminal cases and court appointments in an attempt to extend his own practice. Respondent had previously worked for years in the medical field, and he worked to establish a personal-injury practice as well.

**{¶ 6}** Before leasing office space with DiBlasio, respondent knew Traficant only through intermittent interaction in their community. Afterward, the two became more familiar because Traficant also rented space in DiBlasio's building. Traficant's suite occupied the entire first level of the two-story building. He also had a private office on the second floor.

**{¶ 7}** In January 1996, DiBlasio and respondent formed a partnership that lasted for two years. During this time, DiBlasio continued to pay for the firm's advertising and advanced these expenses and others for respondent's developing personal-injury practice. But in the summer of 1998, DiBlasio unexpectedly announced his retirement.

**{¶ 8}** With DiBlasio's retirement looming, respondent became deeply concerned about the financial end of the partnership, particularly funding the advertising that he considered necessary to build a solid practice. In fact, when DiBlasio expressed his intention to retire, respondent owed him approximately $100,000 for advertising expenses. Moreover, as part of his retirement, DiBlasio planned to sell the building that housed the partnership's offices, to liquidate all of his assets, and to move to Florida. This development also troubled respondent because he had personally remodeled the office space, devoting much time and money to the project.

{¶ 9} Against this backdrop, DiBlasio advised respondent that he would be resigning as Traficant's chief of staff, and he offered to recommend respondent for Traficant's staff. Respondent learned in October 1998 that Traficant was interested in hiring him. Traficant later came to respondent's office and requested that they take a ride to discuss respondent's employment.

{¶ 10} In the car, Traficant offered to hire respondent as an administrative assistant and counsel, explaining that he had always had an attorney on staff and always would. Although respondent had previously performed some work for Traficant, he expressed reservations about what services he could realistically offer as an aide. Traficant reassured respondent, describing various research or constituent projects and other work that he would ask respondent to complete from time to time. Traficant offered respondent an annual salary of $60,000 to $65,000 and said that respondent could maintain his law practice as long as he could still work at Traficant's discretion. Traficant also told respondent that, as a condition of his employment, he would be required to repay $2,500 of his monthly paycheck to Traficant.

{¶ 11} Traficant and respondent's conversation eventually turned to office space. Respondent and Traficant agreed that if respondent paid the kickback and also bought DiBlasio's building, a purchase respondent was already considering, Traficant would rent DiBlasio's office space. Respondent thought that this arrangement would enable him to maintain his private law practice while working for Traficant.

{¶ 12} Respondent accepted the staff position in Traficant's office and started immediately. The job and Traficant's increased lease payments were essential to respondent financially. And in exchange for respondent's job, the kickbacks and leasehold arrangement were essential to Traficant.

{¶ 13} Respondent later discussed with DiBlasio the $2,500 monthly payments that Traficant had demanded. DiBlasio confirmed that he and Traficant

4

had had a similar arrangement. DiBlasio told respondent how to pay the kickback – by cashing his paycheck, placing $2,500 each month in an envelope, and giving the envelope to Traficant.

{¶ 14} Respondent eventually purchased the office building, which was actually owned by a corporation that DiBlasio had formed, for $120,000. He did not, however, buy the building in his own name. Because DiBlasio had told him that ethics rules precluded a congressional staff member from leasing property to a congressman, respondent bought the property using a trade name, KAS Enterprises, registered to his wife. Respondent claimed that this arrangement satisfied congressional ethics rules.

{¶ 15} Over the next year or so, until January 2000, Traficant leased office space from KAS Enterprises in accordance with his and respondent's agreement. Also during this period, respondent paid Traficant over $32,000 in 13 or 14 monthly installments of $2,500. Unlike DiBlasio, however, respondent deposited his paycheck and then withdrew Traficant's kickback, transactions memorialized in bank statements that would eventually be used to prosecute Traficant. Traficant, in turn, paid $656 ($6 a square foot ) per month, a somewhat low rental price for his expanded office space.

{¶ 16} While working for Traficant as his administrative aide and counsel, respondent assisted Traficant in deeding some rural property, referred to as Traficant's farm, to Traficant's daughter. In or around December 1999, respondent prepared a quitclaim deed; however, respondent did not acknowledge his role as the preparer in the space provided because he "didn't feel comfortable" having his name on the document. Respondent knew of tax judgments against Traficant and that Traficant was trying to hide assets from creditors, and respondent feared that transferring this property might constitute a fraudulent conveyance. The deed was later recorded and apparently has not been challenged.

{¶ 17} Relator withdrew its allegation that respondent had violated DR1-102(A)(3). The parties stipulated, the panel agreed, and the board found that respondent had violated DR 1-102(A)(4) and 1-102(A)(6) by making kickbacks to Traficant. Rejecting respondent's claim that he was not acting as Traficant's attorney when he prepared the quitclaim deed, the panel and board also found clear and convincing evidence that, in addition to violating DR 1-102(A)(4) and 1-102(A)(6), respondent had violated 7-102(A)(6), 7-102(A)(7), and 7-102(A)(8) by preparing the deed for Traficant.

## Sanction

{¶ 18} In recommending a sanction for this misconduct, the panel considered the aggravating and mitigating features of respondent's case. See Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). In aggravation, the panel found that respondent had a prior disciplinary record for failing to make required disclosures in direct-mail solicitations. BCGD Proc.Reg. 10(B)(1)(a). And although respondent accepted Traficant's job offer in part because of DiBlasio's retirement and although Traficant had said that the $2,500 payments were merely "loans," the panel found that respondent knew in his heart that the payments were wrong or illegal. On the other hand, the panel did not find a pattern of misconduct or multiple offenses, even though respondent had paid Traficant kickbacks for over one year, concluding instead that the whole transaction was one isolated incident. See BCGD Proc.Reg. 10(B)(1)(c) and (d).

{¶ 19} In mitigation, the panel found that respondent had made a good-faith effort to rectify the consequences of his misconduct inasmuch as he had cooperated in the government's prosecution and had testified against Traficant. BCGD Proc.Reg. 10(B)(2)(c). Respondent had also fully and freely disclosed his transgressions during the disciplinary process, expressed remorse for his

misconduct, and acknowledged that he had acted with poor judgment and dishonesty.  BCGD Proc.Reg. 10(B)(2)(d).  Moreover, three character witnesses and numerous reference letters asserted respondent's good character and reputation for honesty apart from the underlying incidents.  BCGD Proc.Reg. 10(B)(2)(e).  An assistant United States attorney and an FBI agent noted respondent's cooperation during the corruption investigation in Youngstown.  Finally, the panel found that respondent would never repeat his misconduct and had already paid a price for his wrongdoing – respondent's reputation had been under a cloud during the four-year criminal investigation leading to Traficant's conviction.  BCGD Proc.Reg. 10(B)(2)(f).

{¶ 20} Relator initially suggested that respondent be disbarred for his misconduct.  After the panel hearing, however, relator reconsidered and proposed an indefinite suspension.  Respondent advocated a stayed suspension.  The panel recommended a two-year suspension with the last 18 months stayed on the condition that respondent commit no further misconduct.  The board recommended, "based on the nature and seriousness of the offenses," that respondent be suspended from the Ohio bar for two full years.

Review

{¶ 21} Objecting to the board's findings and recommendation, respondent argues that he did not violate DR 7-102(A)(6), (7), and (8) in preparing the quitclaim deed for Traficant.  He also urges us to defer to the panel's recommended sanction or to be more lenient. Relator objects as well, arguing that respondent violated DR 1-102(A)(4) and (6) by leasing office space to Traficant as part of the bribery deal to get on Traficant's congressional staff.  Relator urges us to indefinitely suspend respondent.

{¶ 22} Pursuant to our independent review in disciplinary cases, *Ohio State Bar Assn. v. Reid* (1999), 85 Ohio St.3d 327, 708 N.E.2d 193, paragraph one of the syllabus, we find that respondent violated DR 1-102(A)(4) and (6) first in

paying Traficant kickbacks in exchange for employment and second in leasing office space to Traficant despite being Traficant's employee. We also find, as did the board, that respondent violated these Disciplinary Rules a third time by concealing his name as the preparer of the quitclaim deed that he realized Traficant might use to avoid future creditors. Finally, because respondent's admitted suborning and dishonesty manifest a fundamental breach of his duty to the public, we find that an indefinite suspension is appropriate regardless of any concomitant violations of DR 7-102(A)(6), (7), or (8).

{¶ 23} Few offenses so calamitously violate the public trust placed in the legal profession as does the secret offer of gratuities to a public official. Whether or not a conviction results, this misconduct lays waste to the community's expectation that lawyers will exhibit "the highest standards of honesty and integrity," American Bar Association, ABA Standards for Imposing Lawyer Sanctions (1992) 9, and contributes to the fear that lawyers will "take advantage of public trust if given the opportunity." *Disciplinary Counsel v. Pizzedaz* (1994), 68 Ohio St.3d 486, 487, 628 N.E.2d 1359. We have therefore disbarred attorneys for bribery-related acts involving public officials. See *Cleveland Bar Assn. v. Jurek* (1991), 62 Ohio St.3d 318, 581 N.E.2d 1356 (attorney's bribing of bond commissioner to avoid random judicial assignments warranted permanent disbarment); *Disciplinary Counsel v. DiCarlantonio* (1994)**,** 68 Ohio St.3d 479, 628 N.E.2d 1355 (city attorney who received $15,000 for his part in changing fire ordinance was disbarred), and *Disciplinary Counsel v. Melamed* (1991)**,** 62 Ohio St.3d 187, 580 N.E.2d 1077 (attorney disbarred for paying bribes to court's bond commissioner in order to obtain assignment of his cases to judges of his choice, among other misconduct).

{¶ 24} Despite the magnitude of this misconduct, respondent contends that the mitigating features of his case, mainly his cooperation in the prosecution's case against Traficant, warrant a lesser sanction than indefinite

suspension. Stressing that the disciplinary system exists to protect the public rather than to punish offending lawyers, respondent essentially argues that because he has promised not to pay kickbacks ever again, a more rigorous sanction is unnecessary. We disagree.

{¶ 25} Even after taking a lawyer's cooperation, contrition, and other evidence of mitigation into account, we have historically imposed at least an indefinite suspension when lawyers have paid either a bribe or gratuity to a public official. *Disciplinary Counsel v. McClenaghan* (1991), 57 Ohio St.3d 21, 565 N.E.2d 572; *Bar Assn. of Greater Cleveland v. Italiano* (1986), 24 Ohio St.3d 204, 24 OBR 431, 494 N.E.2d 1113; *Columbus Bar Assn. v. Gloeckner* (1982), 1 Ohio St.3d 83, 1 OBR 120, 437 N.E.2d 1197.

{¶ 26} In fact, we routinely indefinitely suspend lawyers who merely suggest that public officials may be subject to financial influence. *Dayton Bar Assn. v. O'Brien*, 103 Ohio St.3d 1, 2004-Ohio-3939, 812 N.E.2d 1263 (attorney indefinitely suspended for suggesting to client that judge would allow withdrawal of a guilty plea for money); *Columbus Bar Assn. v. Benis* (1983), 5 Ohio St.3d 199, 5 OBR 415, 449 N.E.2d 1305 (attorney indefinitely suspended for offering to influence a member of the governor's staff to get clemency for a client's husband); and *Ohio State Bar Assn. v. Consoldane* (1977), 50 Ohio St.2d 337, 4 O.O.3d 477, 364 N.E.2d 279 (attorney indefinitely suspended for suggesting that he could obtain client's shock probation with a bribe). And contrary to respondent's argument, although these sanctions generally result in combination with a lawyer's conviction for influence-peddling, the fact of a conviction has never been critical to our disposition. Whether or not the lawyer is ultimately held criminally accountable, the lawyer's pledge to spurn such corruption is violated, and the breach of that duty threatens the public interest.

{¶ 27} Moreover, as relator argues, the circumstances preceding respondent's decision to cooperate with federal authorities are not as extenuating

as respondent asserts. Respondent did not alert the FBI about Traficant when agents initially interviewed him on January 21, 2000, while investigating DiBlasio's affairs. By that time, respondent's payoffs to Traficant were routine. And after meeting with the FBI, respondent did not immediately seek legal counsel to help him consider cooperating. He instead reported the meeting to Traficant, who recommended that respondent refuse any further communication with the agency.

{¶ 28} Respondent did not heed Traficant's admonition, and on January 24, 2000, he met with FBI agents again. On that day, respondent again did not raise the possibility of his cooperation. To the contrary, when asked point-blank if he was kicking money back to Traficant, respondent appeared shocked and offered nothing. The inquiring FBI agent recalled respondent's reaction:

{¶ 29} "When I asked him the question, he was very startled. He gave me what I thought was a thousand yard stare. I could tell he didn't know what to do at that point. He seemed very confused. He said something to the effect of I'm not going to help you get Traficant or something. He left the office. He ended the interview and left the office."

{¶ 30} After the second FBI meeting, respondent again reported to Traficant, who became very angry at the news. Then, to avoid any surveillance devices, Traficant and respondent took another ride, drove around for hours, and at some point went to Traficant's office and switched vehicles. In the second vehicle, Traficant offered respondent envelopes of money in a plastic bag and suggested ways that he might explain the surplus funds to exonerate Traficant.

{¶ 31} They ended up in the basement of respondent's home, where Traficant removed $16,000 in cash from some 30 envelopes. Respondent recognized some of the envelopes as those that he had stuffed with cash to pay off Traficant, while others were marked with Traficant's initials in what respondent knew to be DiBlasio's handwriting. Traficant gave the money to respondent, and

respondent took it. On Traficant's direction and in his presence, respondent afterward burned the envelopes in a concrete washtub with a butane torch.

{¶ 32} Respondent later returned to Traficant's office, where Traficant gave him an envelope with $2,500 in cash and some empty envelopes. Respondent took the money and went home to burn the additional envelopes. Before he had completely incinerated the envelopes, however, respondent put out the fire. Finally, respondent decided that what he was doing was wrong.

{¶ 33} Respondent cooperated as a witness for the prosecution against Traficant, and his testimony was instrumental in obtaining that conviction, as well as DiBlasio's eventual conviction for perjury. Moreover, respondent turned over the partially burned envelopes and money to the FBI before the agency offered him an agreement to proffer his story without incrimination. But as relator cogently submits, any mitigating effect of respondent's cooperation is decimated by the timing of his cooperation and the obvious rationale for providing it.

{¶ 34} Respondent benefited for more than one year from paying gratuities to Traficant and leasing him office space. Not until the investigative noose began to tighten did respondent take action to stop the corruption, and only then to save himself from possible criminal liability. He succeeded. For the purpose of his testimony before the grand jury and trial, the prosecution granted respondent use immunity at a subsequent criminal proceeding. Thus, as long as respondent did not perjure himself, he would avoid prosecution.

{¶ 35} For these reasons, respondent's cooperation with federal authorities is of little mitigating effect. We also reject the finding that respondent's illicit association with Traficant represented an isolated incident rather than a pattern of misconduct or multiple offenses. Respondent and Traficant deliberated the consideration respondent would pay for his job and then executed the payment plan for more than one year. Respondent also concealed his preparation of the quitclaim deed for Traficant. Moreover, these acts clearly

constitute the multi-step course of conduct for which an actual suspension must be imposed. *Disciplinary Counsel v. Shaffer*, 98 Ohio St.3d 342, 2003-Ohio-1008, 785 N.E.2d 429.

**{¶ 36}** We do, however, accept all the other factors listed by the panel and board as mitigating. Thus, having found that respondent violated DR 1-102(A)(4) and (6) relative to the gratuities, which included the kickbacks, the lease of office space, and preparing the misleading quitclaim deed, we temper our disposition and do not disbar respondent. Respondent is instead indefinitely suspended from the practice of law. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

_____

Ronald E. Slipski and David C. Comstock Jr., for relator.

Kegler, Brown, Ritter & Hill Co., L.P.A., Geoffrey Stern, and Christopher J. Weber, for respondent.

_____