[Cite as *DeBlasio v. Sinclair*, 2012-Ohio-5848.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| AL RHODES, PERSONAL REPRESENTATIVE OF THE ESTATE OF HENRY A. DIBLASIO, | ) ) ) | |
| | ) | |
| PLAINTIFF-APPELLANT, | ) | CASE NO. 08-MA-23 |
| | ) | |
| V. | ) | OPINION |
| | ) | |
| R. ALLEN SINCLAIR et al., | ) | |
| | ) | |
| DEFENDANTS-APPELLEES. | ) | |

CHARACTER OF PROCEEDINGS: Civil Appeal from Court of Common Pleas of Mahoning County, Ohio Case No. 07CV697

JUDGMENT: Affirmed in part Reversed in part and Remanded

APPEARANCES:
For Plaintiff-Appellant        Atty. Alan J. Matavich
945 Windham Court, Suite 3
Youngstown, Ohio 44512

For Defendant-Appellee        Atty. R. Allen Sinclair
11 Overhill Road
Youngstown, Ohio 44512

JUDGES:

Hon. Gene Donofrio
Hon. Joseph J. Vukovich
Hon. Mary DeGenaro

Dated: December 4, 2012

DONOFRIO, J.

**{¶1}** Plaintiff-appellant Al Rhodes, Personal Representative of the Estate of Henry A. DiBlasio appeals a decision of the Mahoning County Common Pleas Court granting summary judgment in favor of defendants-appellants R. Allen Sinclair, et al. on his claims of fraudulent conversion or transfer brought pursuant to the Ohio Uniform Fraudulent Transfer Act, R.C. Chapter 1336.

**{¶2}** Upon becoming an attorney in 1991, R. Allen Sinclair (Sinclair) joined DiBlasio, an attorney with an established practice, in a partnership to practice law. (Sinclair dep., Vol. I, pp. 8, 29, 34.) Their law office was in a commercial building owned by DiBlasio located at 11 Overhill Road in Boardman, Ohio. (Sinclair dep., Vol. I, p. 63.) DiBlasio steered cases to Sinclair and advanced advertising fees for the partnership. (Sinclair dep., Vol. I, pp. 28-29, 38.)

**{¶3}** DiBlasio abruptly retired a few years later. (Sinclair dep., Vol. I, pp. 29, 35.) Consequently, Sinclair owed DiBlasio money for pending cases and the costs that he had advanced in furtherance of the partnership. (Sinclair dep., Vol. I, p. 30) Sinclair never denied owing DiBlasio any money. (Sinclair dep., Vol. I, p. 30.)

**{¶4}** Sinclair purchased the office building at 11 Overhill from DiBlasio through a company named KAS Enterprises, a fictitious name created by Sinclair and his wife, Kimberly Sinclair. (Sinclair dep., Vol. I, pp. 8, 32.) Kimberly was the owner of KAS Enterprises. (Sinclair dep., Vol. I, p. 9.)

**{¶5}** Subsequently, DiBlasio obtained a judgment against Sinclair in the Mahoning County Common Pleas Court in the amount of $25,610.64 plus interest in case number 2003 CV 638 on February 27, 2003. (DiBlasio Appellate Brief, Appendix 2, p. 2.)

**{¶6}** At the time, Sinclair and his wife resided at 104 Newport Drive in Boardman, Ohio. Sinclair had purchased the home in late 2000. Sinclair purchased the home for $275,000.00 and it was titled solely in his name. (Sinclair dep., Vol. I, p. 12; Sinclair dep., Vol. II, p. 115; Sinclair aff., ¶34; DiBlasio's Exhibit 6.) Sinclair had made a $10,000.00 down payment on the house. (Sinclair dep., Vol. I, p. 14.) And while the property was valued at only $253,000.00, Sinclair and his wife were able to

mortgage the home to ABN AMRO Mortgage Group, Inc. (ABN AMRO) for $276,000.00. (Sinclair aff., ¶¶35, 37, Exhibit A.) Additionally, in August 2002, Sinclair was able to acquire a $67,753.00 home equity line of credit on the home. (Sinclair aff., ¶38, Exhibit B.)

{¶7} As a result of the February 2003 Mahoning County Common Pleas Court judgment DiBlasio obtained against Sinclair, DiBlasio perfected a lien on the Sinclairs' home at 104 Newport Drive. (Sinclair aff., ¶39.) In July 2004, Sinclair transferred the property into his wife's name solely, by quit claim deed. (Sinclair dep., Vol. I, pp. 12-13; Sinclair aff., ¶40; DiBlasio's Exhibit 6.) According to Sinclair, at the time he transferred the property into his wife's name, the principal balance on the ABN AMRO mortgage was $265,087.06 and $47,621.67 remained on the Bank One home equity line of credit. (Sinclair aff., ¶¶41, 43, Exhibits B, C.)

{¶8} With the suspension of his law license looming, Sinclair turned to real estate investing and created a company named Newport Investments, LLC in September 2004.[1] (Sinclair dep., Vol. I, p. 52.) He was the organizer and statutory agent, yet Kimberly was designated as a one hundred percent member. (Sinclair dep., Vol. I, p. 53.) Newport Investments, LLC is a property management company and trustee for certain land trusts created by Sinclair to hold title to investment properties. (Sinclair dep., Vol. I, p. 57.) It collects rents and manages property. (Sinclair dep., Vol. I, p. 57.)

{¶9} Sinclair also created a company later incorporated as Newport Development, Inc. (Sinclair dep., Vol. I, pp. 57, 87-89; DiBlasio's Exhibits 20, 21.) Newport Development, Inc. manages Newport Investments, LLC. (Sinclair dep., Vol. I, p. 57, 110-111.) In effect, Newport Investments, LLC is a pass-through entity in which whatever money came into it goes out to Newport Development, Inc. (Sinclair dep., Vol. I, pp. 57-58.) According to Sinclair, it is common for real estate investment

---

1. Sinclair's law license was indefinitely suspended in December 2004. (Sinclair dep., Vol. I, pp. 8, 27, 69; *Mahoning Cty. Bar Assn. v. Sinclair*, 105 Ohio St.3d 65, 2004-Ohio-7014, 822 N.E.2d 360.) His license was reinstated in 2008, but in May 2012 his resignation was accepted with disciplinary action pending. *Mahoning Cty. Bar Assn. v. Sinclair*, 117 Ohio St.3d 1205, 2008-Ohio-935, 881 N.E.2d 1258; *In re Resignation of Sinclair*, 132 Ohio St.3d 1208, 2012-Ohio-2646, 970 N.E.2d 958.

companies to be structured this way for accounting purposes and tax advantages. (Sinclair dep., Vol. I, pp. 58-61.) Newport Development, Inc. controls all of Sinclair's real estate investments. (Sinclair dep., Vol. I, p. 112.) He is the sole director, president, and treasurer of Newport Development, Inc. (Sinclair dep., Vol. I, pp. 112-113.) Yet, again, his wife, Kimberly, is the sole shareholder. (Sinclair dep., Vol. I, pp. 94-95.)

{¶10} With the impending suspension of his law license and the pursuit of his new venture into real estate investing, Sinclair began purchasing houses in 2004, ultimately buying 22 properties in Mahoning County which he placed in the aforementioned land trusts. Newport Development, Inc. is the beneficiary of most of the land trusts with Newport Investments, LLC as trustee. (Sinclair dep., Vol. II, p. 57.) Of particular interest to DiBlasio in this case are seven homes that Sinclair or his wife purchased and were at some point titled solely in Sinclair's own name. (Sinclair dep., Vol. II, p. 76, et seq., DiBlasio's Exhibits 13-19.) Shortly after buying the properties, Sinclair transferred them to Newport Investments, LLC which then later sold them for a higher price than which Sinclair had paid for them.

{¶11} Meanwhile, in September 2005, DiBlasio obtained another judgment against Sinclair; this time in federal court. The judgment was for $255,000.00 plus interest in the United States District Court, Northern District of Ohio, case number 4: 03 CV 0348. (DiBlasio Appellate Brief, Appendix 3, p. 3.)

{¶12} In 2006, Newport Development, Inc. paid $22,625.16 for repairs and renovations to the Sinclairs' home at 104 Newport Drive. (Sinclair dep., Vol. II, p. 146; DiBlasio's Exhibit 34.) The home was placed in a trust called the 104 Newport Drive Trust on February 12, 2006. (Sinclair aff., ¶45.) Tara Snyder, Sinclair's sister, was designated the sole beneficiary of the trust. (Sinclair aff., ¶46.) Sinclair's wife sold the home to Tara by way of land contract in February 2006. (Kimberly Sinclair dep., p. 116; Sinclair dep., Vol. I, p. 50; DiBlasio's Exhibit 10.) The Sinclairs then purchased a home for themselves at 171 Newport Drive for $300,000.00, which was titled solely in Sinclair's wife's name. (Kimberly Sinclair dep., p. 59-60.)

{¶13} In a deed recorded on July 24, 2006, Snyder quitclaimed her interest in 104 Newport Drive back to Kimberly Sinclair. (Plaintiff's Exhibit 6, p. 4; Kimberly Sinclair dep., p. 58-59.) Then, just a week later, Kimberly transferred the property to Sinclair's mother Thelma Blosser, as trustee of the 104 Newport Drive Trust for nominal consideration. (Plaintiff's Exhibit 6, p. 6; Sinclair dep., Vol. II, p. 111.) After the litigation that led to this appeal was initiated, Blosser resigned as trustee and Sinclair became trustee of the 104 Newport Drive Trust. (Plaintiff's Exhibit 51; Sinclair dep., Vol. II, p. 120.) The property remains titled in Blosser's name as trustee for the trust and is listed as a rental on Newport Development, Inc.'s balance sheet. (Plaintiff's Exhibit 34.)

{¶14} On August 7, 2007, DiBlasio filed his amended complaint against Sinclair. (T.d. 35.) It contained two counts. The first count was for fraudulent conversion or transfer brought pursuant to the Ohio Uniform Fraudulent Transfer Act (UFTA), R.C. Chapter 1336. The second count was for foreclosure on Sinclair's home at 104 Newport Drive. The amended complaint also named as party defendants: Sinclair's wife, Kimberly A. Sinclair; Newport Investments, LLC; Newport Development, Inc.; ABN AMRO Mortgage Group, Inc.; Thelma J. Blosser as trustee; the Mahoning County Treasurer; Tara and Lawrence Snyder; Newport Investments, LLC as trustee of the various 22 land trusts; Sinclair as trustee of the 104 Newport Drive Trust; the 22 land trusts; KAS Financial Group, LLC; Mama Go Shoppin, Inc.; the 104 Newport Drive Trust; and John Doe's 1-40.

{¶15} On October 26, 2007, Sinclair filed a motion for summary judgment. (T.d. 76.) Concerning DiBlasio's first claim under the UFTA, Sinclair argued that neither he nor his wife had made any transfers. They insisted that all transfers of investment properties were undertaken in their capacity as agents for Newport Development, Inc. and Newport Investments, LLC. As for the 104 Newport Drive property, Sinclair claimed the property never qualified as an asset for purposes of the UFTA because it was encumbered by liens that exceeded the property's value.

{¶16} On December 26, 2007, DiBlasio filed a brief in opposition to Sinclair's

motion for summary judgment. (T.d. 93.)  In support of his first claim under the UFTA, DiBlasio argued that there were seven transfers of property in which Sinclair signed his own name without any agency designation.   Also, DiBlasio argued that his amended complaint included claims for civil conspiracy and to pierce the corporate veil to address the alleged fraudulent transfers.  He argued that the Sinclairs' various companies were constructed simply as means of avoiding his judgment liens and that the companies' funds were used for the Sinclairs' personal use.   Regarding the second claim, DiBlasio argued that foreclosure was necessary to determine the priority, validity, and extent of all liens on the subject property.

{¶17} On January 22, 2008, the trial court granted Sinclair's motion for summary judgment finding "that there exists no genuine issue as to any material fact with regard to [DiBlasio's] allegations of fraudulent conversion or transfer brought pursuant to the Ohio Uniform Fraudulent Transfer Act, R.C. Chapter 1336." (T.d. 96.) The court concluded, "Summary Judgment is sustained with respect to [DiBlasio's] claims of fraudulent conversion or transfer brought pursuant to the Ohio Uniform Fraudulent Transfer Act, *only* and judgment is entered in favor of [Sinclair, et al.] and against [DiBlasio] upon those claims contained in [DiBlasio's] Amended Complaint.] (Emphasis added.) (T.d. 96.)  The trial court did not provide any further explanation as to why it believed that Sinclair was entitled to summary judgment on DiBlasio's claims brought pursuant to the Ohio Uniform Fraudulent Transfer Act.  This appeal followed.

{¶18}  DiBlasio's sole assignment of error states:

THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AGAINST APPELLANT ON HIS FRAUDULENT CONVEYANCE CLAIMS.

### Scope of Appealed Judgment Entry

{¶19} Initially, DiBlasio has made an issue of the scope of the trial court's decision in this matter.  In its entry ruling on Sinclair's motion for summary judgment,

the trial court concluded, "Summary Judgment is sustained with respect to [DiBlasio's] claims of fraudulent conversion or transfer brought pursuant to the Ohio Uniform Fraudulent Transfer Act, *only* and judgment is entered in favor of [Sinclair, et al.] and against [DiBlasio] upon those claims contained in [DiBlasio's] Amended Complaint.] (Emphasis added.) (T.d. 96.)  It then added, "All other claims and causes of action remain pending for further adjudication upon the merits." (T.d. 96.)

**{¶20}** As mentioned earlier, DiBlasio's amended complaint set forth two counts – one for fraudulent conversion or transfer under the Ohio Uniform Fraudulent Transfer Act and the other for foreclosure on 104 Newport Drive.  In his response to Sinclair's motion for summary judgment and again now on appeal, DiBlasio maintains that the first count in his complaint also contained two additional causes of action for civil conspiracy and piercing the corporate veil.  In response, Sinclair argues that those causes of action were not contained in the amended complaint.

**{¶21}** Ohio is a notice-pleading state. *York v. Ohio State Highway Patrol*, 60 Ohio St.3d 143, 144, 573 N.E.2d 1063 (1991).  Civ.R. 8(A) requires only that a complaint "contain (1) a short and plain statement of the claim showing that the party is entitled to relief, and (2) a demand for judgment for the relief to which the party claims to be entitled." Under this rule, "a plaintiff is not required to prove his or her case at the pleading stage," and the complaint is sufficient "as long as there is a set of facts, consistent with the plaintiff's complaint, which would allow the plaintiff to recover." *York,* 60 Ohio St.3d at 145, 573 N.E.2d 1063.

**{¶22}** The elements of a civil-conspiracy claim include (1) a malicious combination, (2) involving two or more persons, (3) causing injury to person or property, and (4) the existence of an unlawful act independent from the conspiracy itself. *Universal Coach, Inc. v. New York City Transit Auth., Inc.* (1993), 90 Ohio App.3d 284, 292, 629 N.E.2d 28.

**{¶23}** The elements for piercing the corporate veil are:

(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence

of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud, [an illegal act, or a similarly unlawful act] against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 617 N.E.2d 1075 (1993), at paragraph three of the syllabus, and as modified (bracketed language) by the syllabus in *Dombroski v. WellPoint, Inc.,* 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538.

**{¶24}** A review of the first count of DiBlasio's amended complaint shows that it is primarily confined to a claim under the Ohio Uniform Fraudulent Transfer Act. The first count begins by identifying the two court judgments DiBlasio obtained against Sinclair. It then identifies DiBlasio as a creditor and Sinclair as debtor under the Ohio Uniform Fraudulent Transfer Act, R.C. Chapter 1336. It refers to the remaining defendants as an affiliate and/or insider of Sinclair, clearly referencing the language used by the Ohio Uniform Fraudulent Transfer Act and R.C. Chapter 1336. The remaining paragraphs of the first count track R.C. Chapter 1336's language for a claim under the Ohio Uniform Fraudulent Transfer Act.

**{¶25}** While there is no mention of the word "conspiracy" and the language of the complaint tracks the language of the Ohio Uniform Fraudulent Transfer Act, paragraph twenty-four references all of the named defendants (i.e., two or more) and their "malicious" disregard of DiBlasio's rights and paragraph twenty-three mentions how all of the defendants were "complicit" therein – satisfying the first, second, and third elements of a civil-conspiracy claim. The fourth element can be fairly construed from the allegation of the unlawful transfers themselves.

**{¶26}** As for piercing the corporate veil, the first element can be found in paragraph seventeen where DiBlasio alleges that Sinclair used Newport Development, LLC and Newport Investments, Inc. as "alter-egos" and that they were, in fact, "fictions" and "shams." The second element can be construed as before from

the alleged fraudulent transfers themselves. The injury referenced in paragraph twenty-four satisfies the third element. Lastly, and moreover, in setting for the relief sought for his first claim, DiBlasio specifically seeks an order piercing the corporate veil.

{¶27} While it does appear that DiBlasio may have sufficiently pleaded causes of action for civil conspiracy or piercing the corporate veil, such a determination is likely premature. As indicated, in its entry ruling on Sinclair's motion for summary judgment, the trial court concluded, "Summary Judgment is sustained with respect to [DiBlasio's] claims of fraudulent conversion or transfer brought pursuant to the Ohio Uniform Fraudulent Transfer Act, *only* and judgment is entered in favor of [Sinclair, et al.] and against [DiBlasio] upon those claims contained in [DiBlasio's] Amended Complaint.] (Emphasis added.) (T.d. 96.) By employing the use of the word "only," it appears the trial court was limiting its decision to the claims DiBlasio was advancing under the Ohio Uniform Fraudulent Transfer Act. Therefore, it cannot be said that the trial court necessarily considered and dismissed any of DiBlasio's claims, whether or not they included civil conspiracy and piercing the corporate veil. The trial court's decision seems confined to DiBlasio's claims under the Ohio Uniform Fraudulent Transfer Act.

### *Summary Judgment*

{¶28} An appellate court reviews a trial court's decision on a motion for summary judgment de novo. *Bonacorsi v. Wheeling & Lake Erie Ry. Co.*, 95 Ohio St.3d 314, 2002-Ohio-2220, 767 N.E.2d 707, ¶24. Summary judgment is properly granted when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1976); Civ.R. 56(C).

{¶29} "[A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial

court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some *evidence* of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. * * *" (Emphasis sic.) *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996).

**{¶30}** The "portions of the record" or evidentiary materials listed in Civ.R. 56(C) include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case. The court is obligated to view all the evidentiary material in a light most favorable to the nonmoving party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267 (1977).

**{¶31}** "If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." *Dresher*, 75 Ohio St.3d at 293, 662 N.E.2d 264.

**{¶32}** Summary judgment is appropriate when there is no genuine issue as to any material fact. A "material fact" depends on the substantive law of the claim being litigated. *Hoyt, Inc. v. Gordon & Assoc., Inc.*, 104 Ohio App.3d 598, 603, 662 N.E.2d 1088 (1995), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### Ohio Uniform Fraudulent Transfer Act

**{¶33}** The claims that were adjudicated herein fall under the Ohio Uniform

Fraudulent Transfer Act. "Ohio's Uniform Fraudulent Transfer Act was enacted to create a right of action for a creditor to set aside an allegedly fraudulent transfer of assets. *Sanderson Farms, Inc. v. Gasbarro,* 10th Dist. No. 01AP-461, 2004-Ohio-1460, at ¶40. The Act defines certain types of transfers from a debtor to a transferee as fraudulent. See R.C. 1336.04(A) & R.C. 1336.05. If a transfer is fraudulent, then a creditor has the right to sue the original transferee and any subsequent transferee for the value of the transferred property, subject to certain defenses. R.C. 1336.08." *Esteco, Inc. v. Kimpel*, 7th Dist. No. 07 CO 3, 2007-Ohio-7201, ¶ 8.

**{¶34}** The Ohio Uniform Fraudulent Transfer Act provides various ways in which a creditor can prove that a debtor's transfer of property was fraudulent. One way is to demonstrate that the debtor made the transfer with actual intent to hinder, delay, or defraud the creditor. R.C. 1336.04(A)(1). The act also allows the creditor to set aside fraudulent transfers in other more specific situations. One such situation is when the debtor does not receive a reasonably equivalent value in exchange for the transfer of the property. In that case, the creditor can show that the transfer was fraudulent by proving that (1) the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction or (2) the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer. R.C. 1336.04(A)(2)(a); R.C. 1336.05(A).

**{¶35}** The summary judgment pleadings and this appeal concerns the transfer of seven investment properties and the Sinclairs' previous home at 104 Newport Drive. From November 19, 2004 through July 24, 2006, Sinclair purchased seven investment properties in which he was designated the grantee. (DiBlasio's Exhibits 13-19.) Five of them he bought in his own name and subsequently transferred to Newport Investments, LLC or Newport Investments, LLC, Trustee for no money. One (the sixth) was bought by Kimberly Sinclair who transferred it to Sinclair who then subsequently transferred it to Newport Investments, LLC for no money. One (the seventh) was purchased by Newport Investments, LLC and transferred to Sinclair for

no money who then subsequently transferred it back to Newport Investments, LLC. Sinclair sold each of the properties through Newport Investments, LLC to individual home buyers for more money than the Sinclairs had originally paid for them, realizing $336,100.00.

{¶36} Sinclair acknowledges the transfers but argues that they do not qualify under the Ohio Uniform Fraudulent Transfer Act because he and his wife, Kimberly, purchased the properties as agents for Newport Investments, LLC. However, as DiBlasio points out, in none of those transfers are the Sinclairs designated as agents for Newport Investments, LLC. DiBlasio's Exhibits thirteen through nineteen reflect evidence that seven of the investment properties that the Sinclairs purchased were at one time titled solely in Sinclair's name. It is well settled law of agency that an agent who discloses neither the existence of the agency nor the identity of the principal subjects themselves to personal liability. *Dunn v. Westlake*, 61 Ohio St.3d 102, 106, 573 N.E.2d 84 (1991).

{¶37} Moreover, if they were indeed acting as agents for Newport Investments, LLC, why did they see the need to subsequently re-transfer the properties to Newport Investments, LLC? If they were acting as agents for Newport Investments, LLC, there would have been no need for the subsequent transfers to that company. At the very least, the absence of any agency designation on the transfers creates a genuine issue of material fact with regard to that aspect of DiBlasio's fraudulent transfer claim.

{¶38} Given that there appears to be genuine issues of material fact concerning the status of the transfers themselves, the inquiry next turns to intent. As indicated earlier, the Ohio Uniform Fraudulent Transfer Act allows a creditor to prove that a debtor's transfer of property was fraudulent by demonstrating that the debtor made the transfer with actual intent to hinder, delay, or defraud the creditor. R.C. 1336.04(A)(1.) While the burden of proof lies with the creditor to prove actual intent, it is recognized that direct proof of actual intent may be impossible. *McKinley Fed. S. & L. v. Pizzuro Enterprises, Inc.*, 65 Ohio App.3d 791, 796, 585 N.E.2d 496 (8th

Dist.1990). In *Stein v. Brown*, 18 Ohio St.3d 305, 308-09, 480 N.E.2d 1121 (1985), the Ohio Supreme Court noted that "[d]ue to the difficulty in finding direct proof of fraud, courts of this state began long ago to look to inferences from the circumstances surrounding the transaction and the relationship of the parties involved." Thereafter, statutory provisions in the Act provided guidance.

**{¶39}** R.C. 1336.04(B) provides that actual intent may be determined by consideration given to all relevant factors, including, but not limited to, the following:

(1) Whether the transfer or obligation was to an insider;

(2) Whether the debtor retained possession or control of the property transferred after the transfer;

(3) Whether the transfer or obligation was disclosed or concealed;

(4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

(5) Whether the transfer was of substantially all of the assets of the debtor;

(6) Whether the debtor absconded;

(7) Whether the debtor removed or concealed assets;

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

**{¶40}** Some of R.C. 1336.04(B)'s factors are present in this case. Sinclair made the transfers to an insider, namely Newport Investments, LLC. R.C. 1336.04(B)(1). If the debtor is an individual, the Ohio Uniform Fraudulent Transfer Act defines an insider to include:

(a) A relative of the debtor or of a general partner of the debtor;

(b) A partnership in which the debtor is a general partner;

(c) A general partner in a partnership described in division (G)(1)(b) of this section;

(d) A corporation of which the debtor is a director, officer, or person in control.

R.C. 1336.01(G)(1). Here, Sinclair was the person in control of Newport Investments, LLC. R.C. 1336.01(G)(1)(d). He was the organizer and statutory agent. (Sinclair dep., Vol. I, p. 53.) He testified that he was one of two front people for the company, in control of buying the investment properties. (Sinclair dep., Vol. I, p. 113.)

**{¶41}** Given his position at Newport Investments, LLC and his position as sole director, president, and treasurer of Newport Development, Inc., the company where the money realized on the investment properties flowed to, it is fair to say that Sinclair retained possession or control over the properties after they were transferred. R.C. 1336.01(G)(2). Before the transfers were made, Sinclair had been sued or threatened with suit by DiBlasio. R.C. 1336.01(G)(4). DiBlasio had obtained the Mahoning County Common Pleas Court judgment against Sinclair and the federal suit had already been filed. When Sinclair made the transfers, the transfers were substantially all of his assets. R.C. 1336.01(G)(5). It is apparent from his deposition testimony that he had, in fact, no assets – or, at least, no assets in his name other than the seven aforementioned investment properties which were transferred to Newport Investments, LLC. DiBlasio's Exhibits thirteen through nineteen reflect that Sinclair received nominal consideration for the properties that valued in the tens of thousands of dollars. R.C. 1336.01(G)(8). Lastly, Sinclair was insolvent or became

insolvent shortly after the transfers. (Sinclair dep., Vol. II, p. 43.) Each of these factors creates the existence of genuine issue of material fact concerning Sinclair's actual intent. They also demonstrate that the transfers may be set aside as fraudulent under the Ohio Uniform Fraudulent Transfer Act's other provisions.

**{¶42}** Sinclair's failure to receive a reasonably equivalent value in exchange for the transfers of the property leaves open the possibility that DiBlasio could set aside the transfers under other provisions in the Act that do not necessarily require proof of actual intent. A creditor can show that the transfer was fraudulent by proving that (1) the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction or (2) the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer. R.C. R.C. 1336.04(A)(2)(a); R.C. 1336.05(A). Here, Sinclair's remaining assets were unreasonably small (perhaps nonexistent) in relation to the transactions and he was either insolvent or became insolvent shortly thereafter. Thus, there is enough evidence in the record whereby DiBlasio may be able to sustain his fraudulent transfer claim without having to prove Sinclair's actual intent.

**{¶43}** DiBlasio also sought to set aside the transfer of Sinclair's 104 Newport Drive home from Sinclair to his wife under the Ohio Uniform Fraudulent Transfer Act. In this instance, Sinclair acknowledges that for purpose of the Act, DiBlasio is a creditor and he is an insolvent debtor with respect to the 104 Newport Drive property. However, he argues that the transfer to his wife did not qualify as a transfer under the Act because the property was not an asset.

**{¶44}** The Act defines an asset to mean property of the debtor, but does not include property to the extent that it is encumbered by a valid lien. R.C. 1336.01(B)(1).

**{¶45}** Sinclair purchased the home in late 2000 for $275,000.00. (Sinclair dep., Vol. I, p. 12; Sinclair dep., Vol. II, p. 115; Sinclair aff., ¶34; DiBlasio's Exhibit 6.) Sinclair had made a $10,000.00 down payment on the house. (Sinclair dep., Vol. I, p.

14.)  Sinclair and his wife were able to mortgage the home to ABN AMRO Mortgage Group, Inc. (ABN AMRO) for $276,000.00. (Sinclair aff., ¶ 37.)   Additionally, in August 2002, Sinclair was able to acquire a $67,753.00 home equity line of credit on the home. (Sinclair aff., ¶38, Exhibit B.)

**{¶46}** In July 2004, Sinclair transferred the property into his wife's name solely, by quit claim deed. (Sinclair dep., Vol. I, pp. 12-13; Sinclair aff., ¶40; DiBlasio's Exhibit 6.)   According to Sinclair, at the time he transferred the property into his wife's name, the principal balance on the ABN AMRO mortgage was $265,087.06 and $47,621.67 remained on the Bank One home equity line of credit. (Sinclair aff., ¶¶41, 43, Exhibits B, C.)   Thus, when Sinclair transferred the property into his wife's name, the property was essentially encumbered by a $312,708.73 valid lien.

**{¶47}** When he purchased the home in 2000, Sinclair's mortgage lender had the home appraised at $253,000.00. (Sinclair aff., ¶ 35, Exhibit A.)   In an affidavit attached to his motion for summary judgment, Sinclair incorporated a copy of that appraisal as Exhibit A.   In his affidavit dated 2007 he also stated that the Mahoning County Auditor lists the total market value of the property for tax purposes at $276,200.00. (Sinclair aff., ¶ 50.)   Using either of these values for the property, the property is encumbered by liens beyond its value.   The property therefore does not qualify as an asset under R.C. 1336.01(B)(1).

**{¶48}** DiBlasio argues that the "unsworn copy" of the 2000 appraisal should not have been considered by the trial court as it was not evidentiary material required by Civ.R. 56(E).   Civ.R. 56, the civil rule governing summary judgment motions, and case law does not support DiBlasio's argument in this regard.

**{¶49}** Civ.R. 56 allows a court to consider only "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action" when ruling on a motion for summary judgment. Civ.R. 56(C).  The copy of the 2000 appraisal does not fit any of these categories.

**{¶50}** "The proper procedure for introducing evidentiary matter not specifically authorized by Civ.R. 56(C) is to incorporate it by reference in a properly framed affidavit pursuant to Civ.R. 56(E)." *Biskupich v. Westbay Manor Nursing Home*, 33 Ohio App.3d 220, 222, 515 N.E.2d 632 (8th Dist.1986). "The requirement of Civ.R. 56(E) that sworn or certified copies of all papers referred to in the affidavit be attached is satisfied by attaching the papers to the affidavit, coupled with a statement therein that such copies are true copies and reproductions." *State ex rel. Corrigan v. Seminatore* (1981), 66 Ohio St.2d 459, 467, 423 N.E.2d 105. The referenced papers may also be "sworn or certified" by a certification contained within the paper itself. *Olverson v. Butler*, 45 Ohio App.2d 9, 12, 340 N.E.2d 436 (10th Dist.1975). Finally, it is well settled that unauthenticated documents which are not sworn, certified, or authenticated by way of affidavit have no evidentiary value and may not be considered by the trial court in ruling on a motion for summary judgment. *Citizens Ins. Co. v. Burkes*, 56 Ohio App.2d 88, 95–96, 381 N.E.2d 963 (8th Dist.1978); *Sparks v. Erie Cty. Bd. of Commrs.*, 6th Dist. No. E–97–007, 1998 WL 15929 (Jan. 16, 1998).

**{¶51}** In this case, Sinclair attached a copy of the 2000 appraisal. Paragraph thirty-five of his affidavit incorporates the appraisal by reference:

> At the time of the purchase, my mortgage lender secured an appraisal of 104 Newport from David DiBernardi that estimated the market value of the property as of November 13, 2000 as $253,000, *a true and accurate copy* of which is attached hereto as Exhibit A.

(Emphasis added.) (Sinclair aff., ¶35.) This statement by Sinclair in his affidavit was sufficient to allow the trial court to consider the appraisal as summary judgment evidence.

**{¶52}** The 2000 appraisal aside, Sinclair stated in his affidavit that the Mahoning County Auditor listed the property at $276,200 for tax purposes, well below the outstanding encumbrances of $312,708.73. (Sinclair aff., ¶50.) Yet DiBlasio does not take issue with the Sinclairs' statement concerning the auditor's valuation. So

this uncontested evidence would have been sufficient for the court to find that the property did not qualify as an asset.

**{¶53}** In conclusion, we find there is no genuine issue of material fact concerning whether the 104 Newport Drive property could be set aside under the Ohio Uniform Fraudulent Transfer Act since it was encumbered by liens beyond its value and, therefore, did not constitute an asset under the Act. However, concerning the seven investment properties, DiBlasio did present sufficient evidence to create a genuine issue of material fact as to whether those transfers could be set aside under the Act.

**{¶54}** Accordingly, DiBlasio's sole assignment of error has merit to the extent indicated.

**{¶55}** The trial court's summary judgment decision is affirmed in part with respect to its treatment of the 104 Newport Drive property under the Ohio Uniform Fraudulent Transfer Act. The trial court's decision is reversed in part and remanded for trial concerning whether the transfers of the seven investment properties should be set aside under the Act. As the trial court's decision itself so indicates, all other claims and causes of action remain pending in that court for further adjudication upon the merits.

Vukovich, J., concurs.

DeGenaro, J., concurs.